UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN RUBIN,

               Plaintiff,

      -against-

JAMES B. RUBIN, GRADIENT FUNDAMENTAL
CREDITS, L.P., GRADIENT FC, L.L.C., and
GRADIENT PARTNERS, L.P.,

               Defendants.

**COMPLAINT**

      Plaintiff Steven Rubin, by his attorneys Bingham McCutchen LLP, for his

Complaint against James B. Rubin, Gradient Fundamental Credits, L.P., Gradient FC, L.L.C.,

and Gradient Partners, L.P. (collectively, "Defendants"), alleges as follows:

## BACKGROUND

      1.     Plaintiff brings this action to recover all damages caused by Defendants'

fraud in inducing Plaintiff to invest $2 million in a hedge fund managed, advised and operated by

Defendants, breaches of the various agreements controlling the relationships between the parties,

and breach of the fiduciary duties owed by Defendants. Defendants' fraud and various breaches

have cost Plaintiff a substantial portion of his $2 million investment. Plaintiff made his

investment in reliance on the representations made by defendant James B. Rubin, acting on

behalf of the corporate defendants, as well as the representations defendant James Rubin made

about his personal investment in the fund. As Plaintiff later learned, those representations were

misleading, deceitful and false.

## PARTIES

2.      Plaintiff Steven Rubin ("Mr. Rubin") is a natural person residing in Indian River County, Florida.  Mr. Rubin is a limited partner of defendant Gradient Fundamental Credits, L.P.

3.      Upon information and belief, defendant James B. Rubin ("J. Rubin") is a natural person residing in Westchester County, New York.  J. Rubin controls defendant Gradient FC, L.L.C., as its managing member, and controls Gradient Partners, L.P., as J. Rubin is the President of J.B. Rubin & Company, Inc., which is the general partner of Gradient Partners, L.P. He was and/or is a limited partner of the Partnership.

4.      Upon information and belief, defendant Gradient Fundamental Credits, L.P. (the "Partnership") is a Delaware limited partnership with offices at 10 New King Street, White Plains, NY 10604.

5.      Upon information and belief, defendant Gradient FC, L.L.C. ("FC") is a Delaware limited liability company with its principal place of business at 10 New King Street, White Plains, NY 10604.  FC is the general partner of the Partnership and is controlled by defendant James B. Rubin.

6.      Upon information and belief, defendant Gradient Partners, L.P. ("Gradient Partners") is a Delaware limited partnership with offices at 10 New King Street, White Plains, NY 10604.  Gradient Partners provides investment management services and administrative services to the Partnership, and is controlled by defendant James B. Rubin.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331

2

because this action arises under the laws of the United States, specifically the Investment

Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that

each of the Defendants has its principle place of business, resides, transacts business or may be

found in this district.

## BACKGROUND

9.     Plaintiff is a former energy brokerage industry executive who now devotes

his time to public interest causes focused on inner city youth.

10.     Plaintiff, at all times relevant hereto, retained Marathon Capital Group

("Marathon") as an investment adviser within the meaning of the Investment Advisers Act of

1940, 15 U.S.C. § 80b-1 *et seq.*  Todd N. Kanter ("Kanter") was CEO and majority shareholder

of Marathon and also was Plaintiff's primary contact there.[1]

11.     During the period 1996 through 2003, Plaintiff invested approximately $1

million in MD Sass Re Enterprise Fund LP, a fund managed by defendant J. Rubin who, at that

time was CEO and Partner of MD Sass Investors Services, Inc. ("Sass").  It was in this manner

Plaintiff became familiar with defendant J. Rubin.

12.     Defendant J. Rubin left Sass at the end of 2003.  Upon information and

belief, he started up his own hedge fund in 2005 made up of the corporate defendants along with

---

[1]  On October 8, 2008, Marathon was acquired by Silvercrest Asset Management Group ("Silvercrest") and Plaintiff consented to the assignment of his advisory agreement with Marathon to Silvercrest in accordance with the Investment Advisers Act of 1940.  Following Silvercrest's acquisition of Marathon, Kanter continued to be Plaintiff's primary contact at Silvercrest.  Kanter also became managing director of Silvercrest.

several additional companies, including a master fund and several offshore entities. The fund is known as "Gradient".

13.  Gradient operates under what is known as a "master feeder" structure. A hedge fund is a lightly regulated pooled investment designed to produce absolute returns not bench marked to any particular index. Gradient is made up of the Partnership, a "feeder" fund that invests directly in Gradient FC Master, Ltd. (the "Master Fund"), another feeder fund, Gradient Fundamental Credits, Ltd., receives investments from non-U.S. investors and U.S. tax-exempt investors, and invests its assets in Gradient FC Intermediate, which in turn invests in the Master Fund.

**Plaintiff Invests in Gradient**

14.  In Spring 2007, Kanter recommended to Plaintiff an investment in Gradient, and further indicated that Kanter intended to move his distressed investment allocation from Sass to Gradient at the end of 2007.

15.  Following up on Kanter's recommendation, Plaintiff examined marketing and promotional materials published by Gradient and its manager, defendant J. Rubin.

16.  In addition, on or about June 24, 2007, Plaintiff spoke with J. Rubin by phone to learn more about the investment opportunity. During a lengthy conversation, defendant J. Rubin explained Gradient's background, including the fund's strategy, and represented that it was a great time to invest heavily in distressed companies for long term returns.

17.  J. Rubin further stated to Plaintiff during their June 24, 2007 conversation that he was "personally invested" in the Partnership, with "over $2 million dollars invested" and was "the single largest investor" in the Partnership. J. Rubin never disclosed to Plaintiff that

most of his investment consisted of funds held in trust in connection with his ongoing litigation

with his former employer, Sass.

   18. Upon information and belief, J. Rubin's statement about his personal

investment in the fund was intended to provide Plaintiff with assurance that defendant J. Rubin

had a significant stake in the investment that was directly aligned with that of the limited

partners.  It was an inducement to Plaintiff to purchase a limited partnership interest.

   19. J. Rubin, at no time, told Plaintiff about the nature of his investment in the

Partnership.

   20. Specifically, J. Rubin did not reveal that his "investment" in the

Partnership consisted of deferred compensation from Sass held in trust and subject to an ongoing

dispute.  Upon information and belief, the "investment" was in the form of a 409 Trust (the "409

Trust") for which Sass served as trustee.  J. Rubin was the trust beneficiary.

   21. Plaintiff has also learned that, upon information and belief, J. Rubin was

the *de facto* controller of the trust's investment activities.

**The Contractual Relationship**

   22. Beyond the false and misleading representations J. Rubin made regarding

his own investment in the Partnership, on behalf of the corporate defendants, J. Rubin provided a

copy of the offering documents, including the Gradient Fundamental Credits, L.P. Confidential

Memorandum, dated August 2005 (the "PPM," annexed hereto as Exhibit A), the Limited

Partnership Agreement of Gradient Fundamental Credits, L.P., dated as of October 3, 2005 (the

"LPA," annexed hereto as Exhibit B) and the executed subscription documents (the

"Subscription Documents," annexed hereto as Exhibit C).

23.     The offering documents constitute a valid and binding agreement which governs the relationship between Defendants and all limited partners in the Partnership, including Plaintiff.  The PPM, LPA and Subscription Documents all incorporate each other by reference.

24.     The LPA contains several provisions relevant to the instant dispute. Specifically, Section 5.01 of the LPA states, in relevant part:

> Withdrawals and Distributions in General.  No Partner shall be entitled to . . . (ii) withdraw any amount from such Partner's Capital Account, except as provided in Sec. 5.02, Sec. 5.03 or upon the consent of, and upon such terms as may be determined by, the General Partner in its sole discretion . . . .

25.     Section 5.02 states, in relevant part:

> (a) . . . [E]ach Limited Partner shall have the right *at the end of each fiscal year* . . ., *upon at least 90 days' prior written notice* to the General Partner, to withdraw any or all of the balance in its Capital Accounts as of the last day of the fiscal year that follows the second anniversary of the date of which such Capital Account was established. . . . (Emphasis added)

26.     Section 5.07 states, in pertinent part:  "Unless otherwise specified herein, the effective date of a Partner's withdrawal shall mean the day immediately following:  (i) the Withdrawal Date in the case of a withdrawal pursuant to Sec. 5.02(a). . . ."

27.     The PPM contains similar provisions, setting forth the same 90-day notice period for obtaining redemption (at pp. 10-11, 55) and that redemptions can *only* be done at year end, unless by special approval of the General Partner (Gradient's fiscal year runs concurrently with the calendar year).  The PPM also describes the duties of defendants FC and Gradient Partners as general partner and investment manager of the Partnership (at pp. 41-42) and specifically states that defendant J. Rubin controls both FC and Gradient Partners (at p. 42).

28.     Pursuant to the terms of the PPM (at p. 53), control of the Partnership is vested exclusively with FC.  Investment decisions are made by Gradient Partners as investment manager (*id.* at 42).

29.     Pursuant to the terms of the PMM (at p. 58), for purposes of withdrawal, "the General partner and its affiliates generally will be subject to the [same withdrawal provisions] as the Limited Partners." (Emphasis added)

30.     Based on the recommendation of his investment adviser, his conversation with J. Rubin and the terms set forth in the Offering Documents, on July 1, 2007, Plaintiff invested $1 million in the Partnership.

## J. Rubin's Fraudulent Statement and Omission

31.     Over the next several months, Plaintiff had no contact with J. Rubin directly, but received updates from Kanter, his investment adviser, regarding conversations between Kanter and J. Rubin.  After their communications, Kanter reported that defendant J. Rubin expressed high confidence in their investment positions and prospects for great returns in 2008.

32.     On December 21, 2007, J. Rubin called Plaintiff directly in Europe to discuss the Partnership and J. Rubin's view of the great prospects for the Partnership for 2008. He attempted to convince Plaintiff to withdraw his investment with Sass and purchase an additional interest in the Partnership.

33.     J. Rubin specifically stated that the people then running Sass were not trustworthy and would further their own interests over those of Plaintiff. J. Rubin said "…the folks that are now running that firm, the Sass folks, are just not trustworthy and they will do

A/72831697.2

everything and anything to further their own interests…" The clear implication of J. Rubin's sales pitch was that he, unlike Sass, would prioritize Plaintiff's interests.

34.     In reliance on J. Rubin's representations that he had personally invested in the Partnership and on all other representations made by J. Rubin, both oral and written, Plaintiff invested an additional $1 million in the Partnership on January 1, 2008.

35.     Upon information and belief, at the time of the December 21 phone conversation, J. Rubin had already initiated the process to terminate the Trust and withdraw a portion of his investment from the Partnership by causing the trustees of the 409 Trust to submit a request for special permission to redeem a portion of his interest in the Partnership.

36.     Upon information and belief, the dispute surrounding the funds held in the 409 Trust was resolved at or near the end of 2007, around the same time that J. Rubin directed the partial redemption of the 409 Trust's interest in the Partnership.  It is Plaintiff's understanding that, until resolution of the dispute, the 409 Trust assets could not be moved.

37.     At no time on the December 21, 2007 phone call did J. Rubin inform Plaintiff that he had initiated or planned to initiate a redemption of his interest in the Partnership or that the Trust, which was the vehicle for most of J. Rubin's investment in FC, was being terminated.

38.     Upon information and belief, FC, under J. Rubin's control, approved the 409 Trust's special request for a redemption on February 28, 2008.  On that date, J. Rubin redeemed approximately $300,000 of his Trust investment, which amount was paid on March 31, 2008.

39.     Under the terms of the offering documents, without obtaining special permission from FC (which J. Rubin controlled), a redemption can only be made at Year End

8

and with 90 days' notice. Accordingly, without special permission, the next redemption date would have been the end of December 2008, unless the Trust requested redemption by October 1, 2007, well before Plaintiff spoke to J. Rubin on December 21.

40.    At no time prior to and including February 28, 2008 did J. Rubin tell Plaintiff, the other limited partners or their investment advisers that he was redeeming a portion of his 409 Trust "investment" in the Partnership.

41.    Upon information and belief, in or about April 2008, J. Rubin triggered an additional redemption by causing a notice of redemption and request for special approval to be delivered by the 409 Trust to Gradient Partners, which J. Rubin controls, this time for the entire remaining balance of the Trust (approximately $1.587 million at the time of the redemption on June 23, 2008).

42.    At no time prior to and including June 23, 2008 did J. Rubin tell Plaintiff, the other limited partners or their investment advisers that he was redeeming the entire balance of his 409 Trust "investment" in the Partnership.

43.    Upon information and belief, on May 21, 2008, J. Rubin sent an email to Kanter in response to Kanter's request for J. Rubin's position on whether Kanter/Marathon should invest in the Partnership. J. Rubin stated, "I have high conviction. This is why I am investing more capital of my own – this action pretty much says it all. . . . This is as strong a recommendation as I can make. . . . I therefore strongly suggest investing now." (Emphasis added.)

44.    At all times relevant hereto, J. Rubin was aware that Kanter was acting as Plaintiff's investment adviser, having participated in numerous teleconferences with Kanter and

9

separately with Plaintiff.  Moreover, Gradient paid Marathon a "finder's fee" for referring Plaintiff to Gradient.

45.    J. Rubin's May 21, 2008 statement was false, misleading and deceitful.  J. Rubin had caused his 409 Trust to sent a notice of redemption the prior month.  He was in the process of withdrawing his entire 409 Trust investment, not increasing it.  J. Rubin's statement was thus knowingly false when made.

**J. Rubin Decides to Liquidate Gradient**

46.    On or about June 24, 2008, with no prior warning, J. Rubin informed Plaintiff's investment advisor, Kanter, of his intention to shut down the fund, terminate the Partnership, liquidate the remaining investments and distribute the limited partners' shares over the next few years.  This statement came a mere month after J. Rubin made "as strong a recommendation as [he] can make" to Kanter in an effort to induce Kanter and/or Marathon to invest and to advise his clients, including Plaintiff, to make an additional investment in the Partnership.

47.    On June 25, 2008, Plaintiff emailed J. Rubin and Kanter asking about J. Rubin's intent to terminate the Partnership.  J. Rubin replied that his decision was triggered solely by a small number of Marathon investors seeking early redemptions which requests, Plaintiff later learned, J. Rubin rejected at about the same time he gave special approval for withdrawal of his own 409 Trust "investment."

48.    J. Rubin further stated that the small size of the investment pool meant that these redemptions would make the operating costs too high for the Partnership to continue to be a good investment.

A/72831697.2

49.     Despite the multiple-email discussion between Plaintiff, J. Rubin and Kanter about investors redeeming their interests and the termination/liquidation of the Partnership, at no time did J. Rubin inform Plaintiff that he had already redeemed approximately 90% of his interest in the Partnership for cash, leaving Plaintiff and the other investors with illiquid investments of deteriorating value.

50.     Plaintiff only learned from Kanter on August 7, 2008, long after the fact, that J. Rubin had redeemed almost $1.9 million, the entire value of his 409 Trust investment in the Partnership, on February 28, 2008 (with payment made on March 31) and June 23, 2008 with payment made on June 30, 2008.

51.     On or about August 7, 2008, Plaintiff received a June 2008 account statement indicating that an affiliate of the Manager had redeemed its interest.  The statement did not identify the "affiliate" as the 409 Trust or explain the relation of the "affiliate" to J. Rubin.

52.     Immediately after receipt of this emailed account statement, on or about August 8, Plaintiff had a phone conversation with J. Rubin, Kanter and others in which J. Rubin initially denied that he was a beneficiary of the redemption and further stated that the redemptions were regularly scheduled and not out of the ordinary.  Specifically, on that call J. Rubin said: "Uh, well, uh this was a scheduled redemption made by a Trust, uh, a Trust that I don't control, that, uh, has distributions that are preordained, uh, way in advance, that, uh were scheduled, uh, for this past June….  It was not an action that was taken by me where I said 'ok time to redeem,' uh, you know sometime you know a month or three before the redemption. Again this was a long scheduled uh distribution or redemption that the Trust had to make, uh, that was not something I controlled."

A/72831697.2

53.     When Plaintiff then asked J. Rubin, "What's your relationship to the Trust?" J. Rubin replied " I have zero, uh, formal relationship. I am not the trustee, I am not the grantor, I am not even the beneficiary." The foregoing statements were demonstrably false, as J. Rubin was the beneficiary of the 409 Trust and the redemption, which he admitted later in that call, and because the withdrawal was made outside of the terms of the LPA and PPM.

54.     Relying on all of defendant J. Rubin's representations, both oral and written, and specifically relying on J. Rubin's representation that he was personally invested in the Partnership with over $2 million invested, Plaintiff made two separate investments of $1 million in July 2007 and January 2008, respectively, for a total initial investment of $2 million.

## AS AND FOR A FIRST CLAIM FOR RELIEF
(For Breach of Contract against FC and the Partnership)

55.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

56.     The PPM, LPA and Subscription Documents together make up a valid agreement governing the relationship between Plaintiff, on the one hand, and FC and the Partnership on the other hand.

57.     Plaintiff has fully performed his obligations under the PPM, LPA and Subscription Documents.

58.     FC and the Partnership, by virtue of the conduct described herein, have breached the provisions of the PPA and LPA by permitting the redemption of J. Rubin's interest on less than 90 days' notice and at a time other than the end of the Partnership's fiscal year.

59.     Specifically, FC and the Partnership breached Sections 5.01, 5.02 and 5.07 of the LPA, and page 55 of the PPM by permitting the redemption of J. Rubin's interest before

A/72831697.2

December 31, 2008, specifically on June 23, 2008 (with payment made on June 30), fewer than 90 days after providing notice of redemption.

60.     By virtue of FC and the Partnership's breach as set forth herein, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

## AS AND FOR A SECOND CLAIM FOR RELIEF
(For Breach of Contract against FC and the Partnership)

61.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

62.     The PPM, LPA and Subscription Documents together make up a valid agreement governing the relationship between Plaintiff, on the one hand, and FC and the Partnership on the other hand.

63.     Plaintiff has fully performed his obligations under the PPM, LPA and Subscription Documents.

64.     FC and the Partnership, by virtue of the conduct described herein, have breached the provisions of the PPA and LPA by permitting the redemption of the 409 Trust's interest on less than 90 days' notice and at a time other than the end of the Partnership's fiscal year.

65.     Specifically, FC and the Partnership breached Sections 5.01, 5.02 and 5.07 of the LPA, and page 55 of the PPM by permitting the redemption of J. Rubin's interest be made at any time other than December 31, 2008, specifically on February 28, 2008 (with payment made on March 31), fewer than 90 days after providing notice of redemption.

66.     By virtue of FC and the Partnership's breach as set forth herein, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

## AS AND FOR A THIRD CLAIM FOR RELIEF
(For Breach of Fiduciary Duty against J. Rubin, FC and Gradient Partners)

67.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

68.     FC and Gradient Partners, by virtue of their positions as general partner and investment manager to the Partnership, and J. Rubin, as the control person of FC and Gradient Partners, owe fiduciary duties to Plaintiff, as acknowledged in the PPM.

69.     Among the duties owed to Plaintiff are the duty to treat all investors similarly and the duty not to engage in self-dealing.

70.     J. Rubin engaged in self-dealing by causing the 409 Trust to issue a notice of redemption for his own personal benefit and then approving that redemption request (as controller of FC) without reference to or compliance with the terms of the governing documents.

71.     FC and Gradient Partners improperly permitted J. Rubin to redeem and withdraw his interest in the Partnership, in violation of their fiduciary duties to Plaintiff.

72.     Upon information and belief, at the same time J. Rubin was approving his own non-compliant redemption request, he rejected similar requests from two other limited partners.

73.     Additionally, J. Rubin, FC and Gradient Partners intentionally concealed the fact that J. Rubin had started the process of redeeming his interest in the Partnership. This failure was with full knowledge that Plaintiff, and indeed all limited partners, would find the fact of his redemption material and significant to Plaintiff's own continuing investment in the Partnership.

74.     As a result of J. Rubin's wrongful redemption, the Partnership decreased in value to the detriment of Plaintiff.

14

75.   By virtue of J. Rubin, FC and Gradient Partners' breach of fiduciary duty, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
(For Fraud against J. Rubin)

76.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

77.   On three separate occasions, J. Rubin either specifically represented that he was personally invested in the Partnership and continuing to invest more of his own money or concealed from Plaintiff (or Plaintiff's agent) that he was withdrawing his investment.

78.   In addition, Gradient marketing and promotional materials represented that significant firm capital would be submitted "side by side" with investment by clients.

79.   Plaintiff relied on these misrepresentations both in making his initial investment in July 2007 and for his supplemental investment in January 2008.

80.   On or about June 24, 2007, J. Rubin represented to Plaintiff directly that he was "personally the largest investor" in the Partnership.

81.   On or about December 21, 2007, J. Rubin called Plaintiff in Europe in an effort to persuade Plaintiff to make an additional investment in the Partnership.

82.   These representations were made for the purpose of inducing Plaintiff to invest in the Partnership.

83.   J. Rubin never revealed Plaintiff during the December 21 call that J. Rubin had or was going to request a redemption of a portion of his interest in the Partnership.

A/72831697.2

84.    This omission was material. Had Plaintiff been aware that J. Rubin was redeeming his interest, Plaintiff would not have agreed to invest an additional $1 million in the Partnership.

85.    Plaintiff relied on J. Rubin's statements on the December 21 call, including the omission of this material information, in making an additional investment.

86.    On or about May 20, 2008, J. Rubin informed Kanter, whom he knew to be Plaintiff's investment advisor, that he planned to invest an additional $1 million of his own money. This statement was false when made.

87.    J. Rubin had caused the 409 Trust to issue a notice of redemption for the remaining investment in the Partnership in or about April 2008. That redemption request, which under the terms of the PPM was irrevocable, was still pending when J. Rubin stated to Kanter that J. Rubin planned to invest additional money.

88.    This statement was material, and Plaintiff relied upon it to his detriment in remaining invested in the Partnership. Had Plaintiff known that J. Rubin was redeeming his remaining investment, Plaintiff would have demanded special approval of redemption of his own interest as well.

89.    J. Rubin continued to lie and conceal the fact of his redemption, withholding that information from Plaintiff even after Plaintiff's August 2008 statement indicated that an affiliate of Gradient Partners (but not which) had redeemed its interest.

90.    By virtue of J. Rubin's fraudulent statements and omissions, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

A/72831697.2

## AS AND FOR A FIFTH CLAIM FOR RELIEF
(For Negligent Misrepresentation against J. Rubin)

91.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

92.     J. Rubin, as controller of Gradient and as the individual responsible for making all investment decisions on behalf of the Partnership and the Master Fund, has a special relationship of trust and confidence with Plaintiff.  Indeed, it was only after a conversation with J. Rubin, during which J. Rubin falsely assured Plaintiff that J. Rubin was personally invested in the Partnership, that Plaintiff made his initial investment in the Partnership.  Similarly, Plaintiff made an additional investment based on a second call with J. Rubin, who possesses specialized information regarding Gradient.

93.     On both of the calls, J. Rubin made material misrepresentations and omissions regarding his "personal" investment in the Partnership.

94.     Plaintiff reasonably relied on J. Rubin's misrepresentations and omissions in investing in the Partnership, in making an additional investment, and in not redeeming his interest in the Partnership.

95.     J. Rubin's misrepresentations and omissions, if not made intentionally, were made negligently.

96.     The damages sustained by Plaintiff were a direct and foreseeable result of J. Rubin's misrepresentations and omissions.

97.     By virtue of J. Rubin's misrepresentations and omissions, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

17

### AS AND FOR A SIXTH CLAIM FOR RELIEF
(For Aiding and Abetting Breach of Fiduciary Duty against J. Rubin)

98.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

99.     As set forth in the Third Claim for Relief, FC and Gradient Partners breached their fiduciary duties to Plaintiff.

100.    J. Rubin, as the controller of both FC and Gradient Partners, for his own benefit, knowingly induced or participated in, permitted, provided substantial assistance to FC and Gradient Partners' breach of fiduciary duties by making material misrepresentations and omissions to Plaintiff, including misrepresenting the extent of J. Rubin's personal investment in the Partnership on several occasions, omitting to inform Plaintiff that J. Rubin was redeeming the 409 Trust's interest and personally reviewing and approving the 409 Trust's non-compliant redemption request for his own benefit on two separate occasions.

101.    The damages sustained by Plaintiff are a direct and proximate result of J. Rubin providing aid and assistance to FC and Gradient Partners' breach of fiduciary duties.

102.    J. Rubin's conduct was willful, wanton and reckless. Based on J. Rubin's intentional behavior, Plaintiff is entitled to punitive damages.

103.    By virtue of J. Rubin's material assistance to FC and Gradient Partners in breaching their fiduciary duties to Plaintiff, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
(For Tortious Interference with Contractual Relations against J. Rubin)

104.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

18

A/72831697.2

105.    The PPM, LPA and Subscription Documents together make up a valid agreement governing the relationship between Plaintiff, on the one hand, and FC and the Partnership on the other hand.

106.    Plaintiff has fully performed his obligations under the PPM, LPA and Subscription Documents.

107.    As set forth in the First and Second Claims for Relief, FC and the Partnership have breached their obligations under the parties' agreement.

108.    J. Rubin, as controller of FC, was aware of the parties' agreement.

109.    By reason of the actions described herein, J. Rubin caused, and intended to cause, FC and the Partnership to breach their contractual obligations to Plaintiff.

110.    By virtue of J. Rubin's actions, Plaintiff has been damaged and will continue to be damaged in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
(For Violation of the Investment Advisers Act against J. Rubin and Gradient Partners)

111.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 54 as though fully set forth herein.

112.    J. Rubin and Gradient Partners are each investment advisers within the meaning of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, in that they engage in the business of advising Plaintiff as to the value of securities.

113.    J. Rubin and Gradient Partners have discretionary control over Plaintiff's limited partnership interest in the Partnership.

114.    Under the Investment Advisers Act, J. Rubin and Gradient Partners have a fiduciary obligation to fully disclose all conflicts of interest and to employ reasonable care to avoid misleading investors.

19

115.    Under Section 206 of the Investment Adviser Act, it is unlawful for any investment adviser to employ any device, scheme or artifice to defraud any client or prospective client.

116.    Under Section 206 of the Investment Adviser Act, it is also unlawful for any investment adviser to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client

117.    As alleged herein, J. Rubin and Gradient Partners made material misrepresentations and failed to disclose material facts to Plaintiff in violation of the Investment Advisers Act.

118.    By virtue of J. Rubin and Gradient Partners' material misrepresentations and omissions, the LPA is void under 15 U.S.C. § 80b-15 and Plaintiff is entitled to rescission and restitution.

WHEREFORE, Plaintiff Steven Rubin demands judgment against defendants J. Rubin, the Partnership, FC and Gradient Partners as follows:

(a)    On the First Claim for Relief, judgment in favor of Plaintiff and against FC and the Partnership in a sum to be determined by the Court;

(b)    On the Second Claim for Relief, judgment in favor of Plaintiff and against FC and the Partnership in a sum to be determined by the Court;

(c)    On the Third Claim for Relief, judgment in favor of Plaintiff and against J. Rubin, FC and Gradient Partners in a sum to be determined by the Court;

(d)    On the Fourth Claim for Relief, judgment in favor of Plaintiff and against J. Rubin in a sum to be determined by the Court, together with punitive damages for the willful and intentional misstatements and omissions;

A/72831697.2

(e)      On the Fifth Claim for Relief, judgment in favor of Plaintiff and against J. Rubin in a sum to be determined by the Court;

(f)      On the Sixth Claim for Relief, judgment in favor of Plaintiff and against J. Rubin in a sum to be determined by the Court, together with punitive damages for J. Rubin's willful, wanton and reckless actions;

(g)      On the Seventh Claim for Relief, judgment in favor of Plaintiff and against J. Rubin in a sum to be determined by the Court;

(h)      On the Eighth Claim for Relief, judgment in favor of Plaintiff and against J. Rubin and Gradient Partners rescinding the LPA and granting Plaintiff restitution; and

(i)      Such other and further relief as this Court deems just and proper.

Dated: New York, New York.                    Bingham McCutchen LLP
       February 13, 2009

                                               By: _____
                                                   Daniel M. McGillycuddy
                                                   Theo J. Robins
                                                   399 Park Avenue
                                                   New York, NY  10022-4689
                                                   212.705.7000

                                                   *Attorneys for*
                                                   *Plaintiff Steven Rubin*

A/72831697.2